# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
### WAYCROSS DIVISION

R. Clerk

GREGORY M. LAMB,

      Plaintiff,

    v.

DR. THOMAS FERRELL; JAMES
DONALD, Former Commissioner;
SHIRLYN THOMAS, Deputy Warden;
ALAN ADAMS, State Director of
Inmate Health Services; and BRIAN
OWENS, Commissioner,

      Defendants.

CIVIL ACTION NO.: CV509-011

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff, who is currently incarcerated at Wheeler Correctional Facility in Alamo, Georgia, filed a cause of action pursuant to 42 U.S.C. § 1983 contesting certain conditions of his confinement at Ware State Prison in Waycross, Georgia. Defendants[1] filed a Motion for Summary Judgment, to which Plaintiff filed a Response. For the reasons which follow, Defendants' Motion should be **GRANTED** in part and **DENIED** in part.

---

[1] Plaintiff filed a Motion to voluntarily dismiss his claims against Defendant Darrell Hart and his Americans with Disabilities Act claims. The Honorable Lisa Godbey Wood granted Plaintiff's Motion by Order dated April 5, 2010. (Doc. No. 59).

## STATEMENT OF THE CASE

Plaintiff asserts he has been diagnosed with a rare medical condition and has been prescribed specialty treatment repeatedly. Plaintiff alleges that Defendant Ferrell, the doctor at Ware State Prison, was aware of the treatment he needs (for his rare condition as well as other conditions) but denied this treatment for financial reasons. Plaintiff contends that Defendant Donald, the former Commissioner of the Georgia Department of Corrections; Defendant Owens, the current Commissioner; and Defendant Adams, the Director of Inmate Health Services, were or should have been aware of unconstitutional practices and policies at Ware State Prison and did nothing to correct the practices and policies. Plaintiff also contends Defendant Thomas, the Deputy Warden of Care and Treatment at Ware State Prison, was aware of his medical needs and denied his grievances. Finally, Plaintiff asserts Defendant Thomas retaliated against him by having him transferred to a private prison which uses a different company for its medical services.

Defendants contend that Plaintiff's Eighth Amendment claims fail on the merits. Defendants also contend that Plaintiff's retaliation claim is not exhausted, and it fails on the merits. Defendants allege that they are entitled to qualified immunity. Defendants assert that Plaintiff's claims for damages are limited by 42 U.S.C. § 1997e(e).

AO 72A
(Rev. 8/82)

**Exhaustion of Administrative Remedies**

The determination of whether an inmate exhausted his available administrative remedies prior to filing a cause of action in federal court is a matter of abatement and should be raised in a motion to dismiss. Bryant v. Rich, 530 F.3d 1368, 1374 (11th Cir. 2008). "Even though a failure-to-exhaust defense is non-jurisdictional, it is like" a jurisdictional defense because such a determination "ordinarily does not deal with the merits" of a particular cause of action. Id. (internal punctuation and citation omitted). A judge "may resolve factual questions" in instances where exhaustion of administrative remedies is a defense before the court. Id.

Where Congress explicitly mandates, prisoners seeking relief for alleged constitutional violations must first exhaust inmate grievance procedures before filing suit in federal court. See Porter v. Nussle, 534 U.S. 516, 524 (2002). 42 U.S.C. § 1997e(a) states, "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law . . . until such administrative remedies as are available are exhausted." In Porter, the United States Supreme Court held that exhaustion of available administrative remedies is mandatory. Porter, 534 U.S. at 523. The Supreme Court has noted exhaustion must be "proper." Woodford v. Ngo, 541 U.S. 81, 92 (2006). "Proper exhaustion demands compliance with an agency's deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." Id. at 90-91. In other words, an institution's requirements define what is considered exhaustion. Jones v. Bock, 549 U.S. 199, 218 (2007). It is not the role of the court to consider the adequacy or futility of the administrative remedies afforded to

AO 72A
(Rev. 8/82)

the inmate. Higginbottom v. Carter, 223 F.3d 1259, 1261 (11th Cir. 2000). The court's focus should be on what remedies are available and whether the inmate pursued these remedies prior to filing suit. Id.

Defendants assert that Plaintiff did not file any grievance in which he alleged that Defendant Thomas transferred him from Ware State Prison out of retaliation. Accordingly, Defendants assert that Plaintiff's retaliation claim against Defendant Thomas should be dismissed. Plaintiff contends that he exhausted his administrative remedies to the extent he could, given the limited space provided on the grievance forms. Defendant Thomas states in her Affidavit that Plaintiff's electronic grievance history and his grievance file do not reflect that he filed a grievance in which he alleged that she or anyone else transferred him to Wheeler Correctional out of retaliation. (Doc. No. 33-10).

Myrtle Evans, who is the Grievance Coordinator at Wheeler Correctional Institute, states in her Affidavit that Plaintiff did not allege in any of the seven (7) grievances he filed since his arrival at Wheeler allege that Defendant Thomas or anyone else transferred him from Ware State Prison to Wheeler out of retaliation. Ms. Evans also states that Standard Operating Procedure ("SOP") IIB05-0001 provides that, while inmates cannot file grievances regarding housing assignments, they can file grievances alleging retaliation. Ms. Evans further states that this SOP also provides that inmates are permitted to file a grievance at one penal institution about events which occurred at another institution. Ms. Evans declares that Plaintiff's electronic grievance history and grievance file do not reflect that he filed a grievance in which he alleged that

Defendant Thomas (or anyone else) transferred him from Ware State Prison to Wheeler Correctional out of retaliation. (Doc. No. 33-15, pp. 2-4).

Defendants submitted copies of SOP IIB05-0001, which sets forth the statewide grievance procedure for all inmates committed to the Department of Corrections. This SOP states that each inmate receives verbal and written notice of the grievance procedure upon his or her arrival into the Georgia Department of Corrections. While an inmate cannot file a grievance concerning transfers between institutions (Doc. No. 33-11, p. 4, ¶ 4(c)), an inmate can file a grievance "alleging retaliation, misconduct or harassment . . . regardless of the form." (Id. at ¶ 4(g)). An inmate may file a grievance concerning events occurring at a facility different than that in which the inmate is currently housed, and the grievance will be forwarded to the named facility. (Id. at p. 12, ¶ F(5)).

Plaintiff states in his Affidavit that he requested a grievance form when he arrived at Wheeler Correctional regarding his retaliatory transfer. Plaintiff declares that the correctional sergeant told him that his transfer was a "possitive (sic) transfer", and he could not file a grievance about a transfer or assignment to another prison. (Doc. No. 52-1, p. 48). Plaintiff also declares that he spoke with his case manager the week following his transfer, and his case manager told him he could not file a grievance about a transfer or prison assignment. Plaintiff avers that the case manager also told him the ten (10) day time limit had already expired and filing a grievance would be fruitless even if he could file one, as the private prison had no control over what occurred at a state-run facility.

AO 72A
(Rev. 8/82)

Plaintiff arguably has shown that he attempted to file a grievance regarding his contention that Defendant Thomas transferred him to Wheeler Correctional from Ware State Prison as a retaliatory measure and that staff at Wheeler Correctional told him that he could not file a grievance about this alleged retaliatory transfer. Thus, there is a question remaining as to whether Plaintiff exhausted his available administrative remedies. This portion of Defendants' Motion should be **DENIED**.

## Summary Judgment

### STANDARD OF DETERMINATION

Summary judgment should be granted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving part[ies are] entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); Midrash Sephardi, Inc. v. Town of Surfside, 366 F.3d 1214, 1223 (11th Cir. 2004). An issue of fact is "material" if it might affect the outcome of the case, and an issue of fact is "genuine" when it could cause a rational trier of fact to find in favor of the nonmoving party. Hickson Corp. v. Northern Crossarm Co., Inc., 357 F.3d 1256, 1259-60 (11th Cir. 2004). The court must determine "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Id. at 1260 (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)).

The moving parties bear the burden of establishing that there is no genuine issue of material fact and that they are entitled to judgment as a matter of law. Williamson Oil Co., Inc. v. Philip Morris USA, 346 F.3d 1287, 1298 (11th Cir. 2003). Specifically, the

6

moving parties must identify the portions of the record which establish that there are no genuine issues of material fact. Hickson, 357 F.3d at 1260 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). When the nonmoving party would have the burden of proof at trial, the moving parties may discharge their burden by showing that the record lacks evidence to support the nonmoving party's case or that the nonmoving party would be unable to prove his case at trial. Id. In determining whether a summary judgment motion should be granted, a court must view the record and all reasonable inferences that can be drawn from the record in a light most favorable to the nonmoving party. Acevado v. First Nat'l Bank, 357 F. 3d 1244, 1247 (11th Cir. 2004).

## DISCUSSION AND CITATION TO AUTHORITY

### I.    Deliberate Indifference[2]

Defendants generally assert that Defendant Ferrell was not deliberately indifferent to Plaintiff's serious medical needs. Defendants contend that Plaintiff appears to disagree with Defendant Ferrell's prescribed courses of treatment for Plaintiff's numerous conditions, which is not sufficient to present an Eighth Amendment claim for relief.

#### A. Testicular "Tumor"/Enlarged Prostate

Defendants contend that Defendant Ferrell sent Plaintiff to have an ultrasound, which revealed a right epididymal cyst, and conducted blood tests, which were within normal limits. Defendants assert these results led Defendant Ferrell to conclude that

---

[2] The Court has separated the facts relating to each individual medical condition Plaintiff is alleged to suffer, as Defendants have in their Motion and Plaintiff did in his Complaint. However, the Court will address the legal aspects of Plaintiff's claims in one section.

Plaintiff's testicular mass was benign and was not a threat to his health. Defendants also assert that Defendant Ferrell continued to monitor this mass, and he had no reason to believe that the mass "had changed significantly." (Doc. No. 33-1, p. 16).

Plaintiff states that the sonogram performed in January 2008 only confirmed the existence, size, and shape of the testicular growth he had, not whether the growth was a tumor, a cyst, or a hernia, or whether it was benign or malignant. Plaintiff contends that he asked Defendant Ferrell to provide him with an antibiotic for a "very obvious infectious [f]luid", but Defendant Ferrell would not give him the antibiotic because it would make the condition worse. (Doc. No. 1, p. 15). Plaintiff also contends that Defendant Ferrell told him the growth was probably just a cyst, which was not going to kill Plaintiff. Plaintiff alleges that he requested treatment for the testicular growth on four (4) other occasions, and Defendant Ferrell would not give him treatment or approve an outside consult with an urologist. Plaintiff also alleges that he suffers from extreme testicular sensitivity, erectile dysfunction, bladder leakage, penal discharge, and a burning sensation when he urinates.

As to Plaintiff's complaints about having an enlarged prostate, Defendants contend that Defendant Ferrell performed two (2) rectal examinations of Plaintiff, and both of these examinations "revealed a three-plus enlargement of the prostate with no nodules which is indicative of moderate enlargement of the prostate." (Doc. No. 33-1, p. 19). Defendants also contend that Defendant Ferrell believed that it would be best to try a conservative route of managing his urinary frequency by decreasing his fluid intake after dinner rather than adding another medication to Plaintiff's long list of medications.

Plaintiff asserts that his prostate is three (3) times its normal size, and he has constant discomfort and sleep deprivation, as he has to wake up several times a night to urinate. Plaintiff alleges that he tried to explain his situation to Defendants Ferrell and Thomas, but they housed him in a television room with no toilet. Plaintiff contends that he is lucky if he gets two (2) hours of sleep a night, and, because of his lack of sleep, he is tired, agitated, and depressed. Plaintiff alleges that the most widely prescribed medication for enlarged prostates are Avodart and Flomax, but Defendant Ferrell would not provide either of these medications to Plaintiff. Plaintiff also alleges that Cardura is a cheaper drug which is commonly prescribed to inmates, but Defendant Ferrell took Plaintiff off this medication because it can cause dangerously low blood pressure; however, Plaintiff alleges, Defendant Ferrell failed to provide any alternative treatment.

Defendant Ferrell states in his Affidavit that Nurse Gail Ferra saw Plaintiff on January 2, 2008, at which time Plaintiff complained about having a tender lump on his testicle for two (2) weeks and that his testicle was receding. Nurse Ferra examined Plaintiff's testicle, found a marble-sized mass, and referred Plaintiff to Defendant Ferrell for further evaluation. (Doc. No. 33-7, p. 3, ¶ 7; Doc. No. 33-8, p. 6). Defendant Ferrell declares that he ordered blood tests—specifically a human Chronic Gonadatropin ("hCG") test, an Alpha Fetoprotein tumor marker test, and a Prostate Specific Antigen ("PSA") test— to determine the probability of malignancy for Plaintiff's testicular mass. (Doc. No. 33-7, p. 4, ¶ 9; Doc. No. 33-88, p. 10). Defendant Ferrell also declares that the results of the hCG and Alpha Fetoprotein tests were "within normal limits." (Doc. No. 33-7, p. 5, ¶ 12). Defendant Ferrell further declares that Plaintiff's PSA test showed a PSA of 2.9, and, if the PSA score is less than 4, a follow-up might be required in 6 to

AO 72A
(Rev. 8/82)

12 months' time. (Id.; Doc. No. 33-8, p. 14). Defendant Ferrell states that he requested that Plaintiff have an ultrasound to determine whether the mass was solid or cystic; the ultrasound was performed two (2) days later, which showed a right epididymal cyst measuring 2.5 x 1.8 x 1.7 cm and an "otherwise unremarkable ultrasound." (Doc. No. 33-7, p. 4, ¶ 11; Doc. No. 33-8, pp. 12-13). Approximately two (2) weeks later, Defendant Ferrell avers, he explained to Plaintiff that benign testicular masses were common in men his age and do not pose any health threat, provided the masses are monitored regularly. Defendant Ferrell states that he also explained to Plaintiff that the mass was benign based on the results of the ultrasound and the blood tests, and there was no medical reason mandating its removal or that it be biopsied since the mass was not solid tissue. (Doc. No. 33-7, p. 6, ¶ 15). Approximately three (3) months later, Plaintiff had another PSA test, which showed a PSA of 2.6, which is within the normal limits. (Doc. No. 33-7, p. 10, ¶ 25; Doc. No. 33-9, pp. 5, 7). Defendant Ferrell states that, two (2) weeks after this PSA test, Plaintiff complained to him about having to urinate 4 to 5 times a night. However, Defendant Ferrell also states, Plaintiff refused to undergo any sort of physical examination. Defendant Ferrell declares that he considered Plaintiff to have "moderate urinary frequency", which he believed did not pose a significant threat to Plaintiff's health. Defendant Ferrell also declares that the only medication he had available to treat Plaintiff's enlarged prostate was Cadura; however, this medication can lower a person's blood pressure, and, since Plaintiff had postural hypertension (which can lead to fainting with sudden standing), Defendant Ferrell determined Cadura's benefits would be outweighed by its risks. In addition, Defendant Ferrell thought adding another medication to Plaintiff's medication regimen

AO 72A
(Rev. 8/82)

would not be in Plaintiff's best interest. Thus, Defendant Ferrell asserts, he recommended conservative management of Plaintiff's urinary frequency, such as decreasing his fluid intake after dinner. (Id. at p. 11, ¶ 26; Doc. No. 33-9, p. 8). Finally, Defendant Ferrell declares that he examined Plaintiff's prostate in September and December 2008, and he found no reason to believe that Plaintiff's testicular mass had changed significantly. (Doc. No. 33-7, p. 14, ¶ 34; p. 16, ¶ 39; pp. 20-21, ¶ 48).

### B. Hernias

Defendants allege that Plaintiff did not complain about having hernias at any time, and Defendant Ferrell had no reason to believe Plaintiff had a hernia which posed a risk to his health. Defendants assert that, even if Defendant Ferrell knew that Plaintiff had a hernia, he would not have recommended Plaintiff undergo surgery, as Plaintiff would have continued to suffer side effects from his smoking and GERD (gastroesophageal reflux disease). Defendants also assert that hernia surgery "is a distant option for those with complications such as an esophageal stricture, which [Plaintiff] did not have." (Doc. No. 33-1, p. 17). Defendants state that Plaintiff cannot show he was damaged in any way because he did not receive an MRI of any hiatal hernia or have his abdominal hernia removed.

Plaintiff asserts that his hiatal hernia makes it difficult to swallow and causes food to get stuck in his esophagus. Plaintiff also asserts that Defendant Ferrell issued a medical profile that he could not lift anything over ten (10) pounds because of his abdominal hernia. Plaintiff alleges that Defendant Ferrell determined that neither hernia

AO 72A
(Rev. 8/82)

qualified as immediately life threatening and refused treatment until one or both become life threatening.

Defendant Ferrell states that Plaintiff did not tell him that he had hernias or that he wanted his hernias surgically repaired. Defendant Ferrell also states that his examinations of Plaintiff did not reveal any reason for him to believe that a hernia posed a risk to Plaintiff's health. Defendant Ferrell further states that hiatal hernias are common in middle-aged men and can cause heartburn and regurgitation, which are symptoms of GERD and exacerbated by heavy smoking. Defendant Ferrell avers that, even had he known that Plaintiff had a hiatal hernia, he would not have recommended surgical repair because of Plaintiff's GERD and continued smoking; he did not believe Plaintiff would have a lasting benefit from a surgical repair; and Plaintiff did not have complications associated with hiatal hernias such that surgical repair was a true option for Plaintiff. Defendant Ferrell states that he had no reason to believe that Plaintiff had an abdominal hernia or that surgical repair of this alleged hernia was warranted.

### C. Colon Polyps

Defendants contend that there is no medical evidence which supports Plaintiff's allegation that polyps remained in his colon after he had a colonoscopy. Defendants assert that the typed report showed a benign polyp was removed from Plaintiff's colon, but this report does not indicate that other polyps remained in Plaintiff's colon. Defendants also assert that the handwritten consult from Dr. Chamberlin does not indicate that additional polyps needed to be removed or that Plaintiff needed immediate follow-up surgery. Defendants further assert that Dr. Chamberlin told Defendant Ferrell

AO 72A
(Rev. 8/82)

that Plaintiff had anal warts on the dentate line which needed to be removed, not additional polyps which needed to be removed from his colon.

Plaintiff contends that he had three (3) colon polyps removed, and the surgeon discovered other polyps or warts that he was unable to reach. According to Plaintiff, the surgeon wrote a report advising that Plaintiff should be scheduled for another surgery as soon as possible. Plaintiff asserts that Defendant Ferrell did not see or examine him until a week after this surgery, at which time Defendant Ferrell refused to provide anything to relieve the severe bloating Plaintiff was suffering from due to the surgery. Plaintiff alleges that he informed Defendant Ferrell that the surgeon stated that Plaintiff needed another surgery and that the polyps which he removed should have been tested for cancer. Plaintiff also alleges that Defendant Ferrell told him he could not read the surgeon's handwriting and would look into it, but Defendant Ferrell did nothing, even though a nurse had written neatly that Plaintiff needed another surgery. Plaintiff further asserts that an Internal Affairs investigator looked into Plaintiff's claims, found them to be verified by Plaintiff's medical records, and instructed Defendant Ferrell to follow up on the surgical consult. Plaintiff avers that Defendant Ferrell still did not provide him with surgery. Plaintiff also avers that he began passing blood when he defecated, and Defendant Ferrell told him not to worry about it.

Defendant Ferrell avers that Plaintiff had a colonoscopy at Augusta State Medical Prison about a month after his arrival at Ware State Prison, and, when he saw Plaintiff about a week after that, he was aware that Dr. Chamberlin, the consulting gastroenterologist, removed a polyp during this procedure. Defendant Ferrell also avers that Dr. Chamberlin's handwritten notes did not indicate that additional polyps needed to

be removed from Plaintiff's colon or anus, and such a recommendation had to have been clearly noted. (Doc. No. 33-7, pp. 5-6, ¶ 14; Doc. No. 33-8, p. 20). Defendant Ferrell states that the characteristics of the removed polyp indicated that it was benign. (Doc. No. 33-7, p. 7, ¶ 16; Doc. No. 33-8, p. 21). Defendant Ferrell declares that he spoke with Dr. Chamberlin several months later, and Dr. Chamberlin told him that Plaintiff had several anal warts which needed to be removed, but he did not tell him that Plaintiff had more polyps in his colon that needed to be removed. Defendant Ferrell declares that Plaintiff's anal warts were removed about two (2) months later during a general surgery consult, which Defendant Ferrell scheduled. Plaintiff was prescribed an ointment for any discomfort associated with this procedure. (Doc. No. 33-7, pp. 15-16, 18, ¶¶ 37-39, 41; Doc. No. 33-9, pp. 29-34). Defendant Ferrell also declares that there was no evidence that Plaintiff suffered any additional discomfort or bleeding from these warts, that the warts multiplied, or that he had an increased risk of malignancy (a risk which is very small) because these warts were removed about a year after Plaintiff underwent his colonoscopy. (Doc. No. 33-7, p. 17, ¶ 42).


### D. Spastic Dysphonia

Defendants allege that Defendant Ferrell did not provide Plaintiff with botox injections for his spastic dysphonia because Defendant Ferrell did not believe it was a medical necessity and because Defendant Ferrell believed the Georgia Department of Corrections' Summary of Healthcare Benefits prohibited him from providing this treatment to Plaintiff. Defendant Ferrell asserts that he did not see any evidence that

AO 72A
(Rev. 8/82)

Plaintiff was medically harmed or suffered any risk to his health because he did not receive botox injections and that he was able to understand Plaintiff's speech.

Plaintiff asserts that he was given botox injections prior to his arrival at Ware State Prison. Plaintiff also asserts that Defendant Ferrell decided that the shots were too expensive to use as treatment for a condition that was not life threatening. Plaintiff contends that Defendant Ferrell is not a specialist and could not "comprehend the potential permanent damage that can be caused to the Plaintiff's vocal cords from having to strain so hard to speak." (Doc. No. 52, p. 8). According to Plaintiff, the botox injections relieve his spasms and allow him to speak more easily and clearly. Plaintiff alleges that his condition has been diagnosed by dozens of specialists, who all concluded he needed botox injections, and Defendant Ferrell intentionally interfered with his prescribed course of treatment. Plaintiff also alleges that his voice is so hoarse and "strangled" even a layperson can recognize the need for medical treatment. (Id.).

Defendant Ferrell avers that spastic dysphonia is not a life-threatening condition, and people with this condition can still speak and be heard by others. Defendant Ferrell states that Plaintiff was scheduled to receive a botox injection from medical personnel at Hays State Prison when he was transferred to Ware State Prison. (Doc. No. 33-7, pp. 2-3, ¶ 6; Doc. No. 33-8, p. 1). Defendant Ferrell also states that he asked Terry Wilson, the Health Services Administrator at Ware State Prison, whether botox injections for spastic dysphonia were covered under the Georgia Department of Corrections' Summary of Healthcare Benefits. Mr. Wilson informed Defendant Ferrell that using botox injections for this condition was not approved by the Food and Drug Administration ("FDA"), and, for this reason, Defendant Ferrell avers he could not

approve these injections for treatment of Plaintiff's condition. Defendant Ferrell also avers that Dr. Sharon Lewis, the Georgia Department of Corrections' Statewide Medical Director, and Dr. Edward Bailey, the Georgia Correctional Healthcare Statewide Medical Director, agreed with his decision. (Doc. No. 33-7, p. 8, ¶ 20; Doc. No. 33-8, pp. 25-39). Defendant Ferrell states that he saw Plaintiff on at least three (3) other occasions regarding his spastic dysphonia. (Doc. No. 33-7, pp. 13-15, ¶¶ 30, 34, 36; Doc. No. 33-9, pp. 15, 23, 27). According to Defendant Ferrell, he did not see any evidence that Plaintiff was medically harmed or suffered any risk to his health because he did not receive botox injections as treatment for his spastic dysphonia. Defendant Ferrell states that Plaintiff spoke with a raspy, quiet voice due to his condition, but he was always able to understand Plaintiff's speech. (Doc. No. 33-7, p. 20, ¶ 46).

### E. Acid Reflux (GERD)

Defendants assert that Defendant Ferrell and the Ware State Prison medical staff provided Plaintiff with extensive care for his GERD. Defendants also assert that Defendant Ferrell prescribed Prilosec, Zantac, and an antacid; advised Plaintiff to sit up for three (3) hours after every meal; and ordered an H-Pylori blood test to determine whether Plaintiff had an H-Pylori infection.[3] Defendants allege that Plaintiff was placed in the chronic care clinic so that his GERD could be followed more closely. In addition, Defendants allege, Plaintiff continued to smoke after being advised to quit, as smoking can negatively impact symptoms of GERD and contribute to treatment failure.

---

[3] Helicobacter pylori is a bacterium which infects the stomach and the first part of the small intestine. This infection can lead to serious complications, such as ulcers and stomach cancer. www.mayoclinic.com/health/h.pylori/DS00958 (May 30, 2009).

AO 72A
(Rev. 8/82)

Plaintiff contends that Defendant Ferrell concluded that the wedge pillow Plaintiff had been given at another prison and which helped alleviate the symptoms of his GERD was a luxury that he could not approve. Plaintiff contends that he has been prescribed generic Prilosec, Zantac, and over-the-counter antacids, but these medications have not helped. Plaintiff asserts that Defendant Ferrell refused to refer him to a "gastrologist" (sic) or other specialist to properly diagnose and treat his "unusual" acid reflux disease. (Doc. No. 1, p. 24). Plaintiff also asserts that the acid is "undoubtedly" causing severe damage to his esophagus and lining of his lungs. (Id.).

Defendant Ferrell states that Plaintiff was issued antacid tablets and could take as many as 16 pills a day. Plaintiff was also advised to stop smoking. (Doc. No. 33-7, p. 9, ¶ 22). Defendant Ferrell also states that Plaintiff complained of frequent regurgitation at night while lying down and said that the Zantac was not helping him. Defendant Ferrell declares that he examined Plaintiff, prescribed Prilosec 20 mg once a day for 90 days, and advised Plaintiff to sit up for three (3) hours after meals. (Doc. No. 33-7, p. 13, ¶ 30; Doc. No. 33-9, pp. 15-16). Two (2) months later, Defendant Ferrell states, he continued Plaintiff's prescription for an antacid for two (2) pills, four (4) times a day for 30 days; about two (2) weeks after that, Defendant Ferrell states Nurse Ferra placed Plaintiff in the chronic care clinic so his GERD could be followed more closely. Defendant Ferrell declares that he saw Plaintiff about a week later, and he ordered lab work consisting of several tests, including an H-Pylori test, which came back negative for the presence of this bacterium. Defendant Ferrell avers that he prescribed Pepto Bismol, two (2) tablets, four (4) times a day for 60 days. (Doc. No. 33-7, pp. 14-15, ¶¶ 32-36). Defendant Ferrell states that, in his opinion, there was no indication that

AO 72A
(Rev. 8/82)

Plaintiff needed surgery for his GERD, and his smoking could negatively impact his symptoms and contribute to treatment failure. (Doc. No. 33-7, p. 21, ¶ 49).

### F. Degenerative Spinal Disease

Defendants aver that there is no credible evidence that Defendant Ferrell should have sent Plaintiff to a neurologist. Defendants contend that Defendant Ferrell provided Plaintiff with extensive care for his cervical disk disease and pain through evaluations, pain medications, and modified profiles. Defendants assert that Defendant Ferrell treated Plaintiff's neck pain conservatively, and he did not find that Plaintiff was a proper candidate for neck surgery.

Plaintiff contends that Defendant Ferrell gave him a cortisone shot, which provided minimal mobility in his right arm. Plaintiff also contends that Defendants made no effort to identify the cause of his physical disability. Plaintiff further contends that he was examined by an ENT (an ears, nose, throat specialist), who recommended that Plaintiff be examined by a neurologist and prescribed 300 mg of Neurontin three (3) times a day. Plaintiff asserts that it was only after he filed a formal grievance that Defendant Ferrell approved the Neurontin for Plaintiff's cervical pain and spasms. Plaintiff also asserts that Defendant Ferrell chose to treat his pain symptoms rather than identifying and treating the cause of his cervical and spinal pain and spasms.

When Plaintiff arrived at Ware State Prison, Nurse Ferra ordered six-month profiles for a bottom bunk, two pillows, and no lifting of more than ten (10) pounds, and Defendant Ferrell continued Plaintiff's prescriptions for Ultram 50mg and Vistaril 25 mg. (Doc. No. 33-7, p. 2, ¶ 5; Doc. No. 33-8, pp. 1-2). Defendant Ferrell states that, about

AO 72A
(Rev. 8/82)

three (3) weeks after Plaintiff's arrival at Ware State Prison, he ordered that Plaintiff receive Neurontin 300 mg and ibuprofen 200 mg three (3) times a day for 90 days, and, a few days later, Ultram 50 mg twice a day for 90 days for the chronic pain in his back, neck, and shoulders. (Doc. No. 33-7, p. 4, ¶¶ 9-10; Doc. No. 33-8, p. 10-11). Based on Defendant Ferrell's Affidavit and Plaintiff's medical records, over the course of Plaintiff's remaining stay at Ware State Prison (approximately one full year), Plaintiff was seen in medical concerning shoulder, back, and/or neck pain approximately ten (10) times. Plaintiff: had an x-ray; was diagnosed with tendonitis; was given two injections for pain relief; was assessed with degenerative arthritis; was educated about his spinal disease and managing the side effects; had his wellness walk discontinued for 6 months; was given another profile for a bottom bunk and no lifting of more than 10 pounds; and had his pain medications renewed and/or increased based on his complaints of pain. (Doc. No. 33-7, ¶¶ 17, 19, 28, 30, 31, 34, 36, and 40). Defendant Ferrell declares that he believed it to be in Plaintiff's best interest to care for Plaintiff's condition conservatively and to delay surgery until "it was clear that [Plaintiff's] impairment was progressive[ ]", and that Plaintiff did not have "any objective signs of increasing neurological deficit." (Doc. No. 33-7, p. 18, ¶ 43).[4]

### G. Sinusitis

Defendants assert that Defendant Ferrell did not find that Plaintiff required sinus surgery, as the intensity of symptoms and complications necessitating surgical

---

[4] Defendant Ferrell states that surgery on the cervical spine is complex and should be considered a distant option of care; there is usually little benefit from the surgery; and the risks of this surgery include permanent damage to the spinal cord and possible paralysis, which were increased given Plaintiff's age. (Doc. No. 33-7, p. 18, ¶ 43).

AO 72A
(Rev. 8/82)

intervention were not present. In addition, Defendants assert that Defendant Ferrell would not consider Plaintiff for sinus surgery unless he stopped smoking.

Plaintiff contends that, when he lies down, his nasal cavities fill with blood. Plaintiff also contends that he constantly has difficulty breathing through his nose. Plaintiff avers that his nasal discomfort is a contributing factor to his insomnia. According to Plaintiff, this condition can be corrected easily by a "very simple surgical procedure", but Defendant Ferrell would not approve this treatment because he did not think this condition was life threatening. (Id. at p. 26).

Defendant Ferrell declares that, based on his evaluations, Plaintiff had a moderate case of allergic rhino-sinusitis and hay fever. Defendant Ferrell also declares that these problems were treated in the usual, standard manner with antihistamines and nasal steroids. Defendant Ferrell further declares that smoking has a significant impact on these conditions, but Plaintiff continued to smoke, despite recommendations that he stop. Defendant Ferrell avers that the intensity of symptoms and complications necessitating surgical intervention were not present with Plaintiff, and he would not have considered surgery for Plaintiff unless he had stopped smoking. (Doc. No. 33-7, pp. 19-20, ¶ 45).

### H. Chronic Insomnia

Finally, Defendants assert that Defendant Ferrell does not recall Plaintiff ever complaining about insomnia. Defendants also assert that, even if Defendant Ferrell had been made aware of Plaintiff's complaints of insomnia, the Georgia Department of Corrections' Summary of Healthcare Benefits prohibited him from prescribing

AO 72A
(Rev. 8/82)

medications for sleep disorders. Defendants further assert that, if Defendant Ferrell could have prescribed medication to Plaintiff for his alleged insomnia, he would have been hesitant to do so because the sleep medication could have had an adverse impact on Plaintiff when combined with the significant amount of pain medications Plaintiff was taking, such as Neurontin, Ultram, and ibuprofen.

Plaintiff avers that Defendants admitted under oath that sleep is a basic need and that sleep deprivation can cause many ailments, such as an increased risk of heart disease, cognitive impairment, memory loss, confusion, mood disturbances, and weight loss or gain. Plaintiff states that, based on these admissions, it is obvious that chronic insomnia is a serious medical condition which warrants treatment to reduce the risks of other serious illnesses.

The Eighth Amendment's proscription against cruel and unusual punishment imposes a constitutional duty upon a prison official to take reasonable measures to guarantee the safety of inmates. The standard for cruel and unusual punishment, embodied in the principles expressed in Estelle v. Gamble, 429 U.S. 97, 104 (1976), is whether a prison official exhibits a deliberate indifference to the serious medical needs of an inmate. Farmer v. Brennan, 511 U.S. 825, 828 (1994). However, "not every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." Harris v. Thigpen, 941 F.2d 1495, 1505 (11th Cir. 1991) (quoting Estelle, 429 U.S. at 105). Rather, "an inmate must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Hill v. DeKalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1186 (11th Cir. 1994).

AO 72A
(Rev. 8/82)

In order to prove a deliberate indifference claim, a prisoner must overcome three obstacles. The prisoner must: 1) "satisfy the objective component by showing that [he] had a serious medical need"; 2) "satisfy the subjective component by showing that the prison official acted with deliberate indifference to [his] serious medical need"; and 3) "show that the injury was caused by the defendant's wrongful conduct." Goebert v. Lee County, 510 F.3d 1312, 1326 (11th Cir. 2007). A medical need is serious if it "'has been diagnosed by a physician as *mandating* treatment or [is] one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" Id. (quoting Hill, 40 F.3d at 1187) (emphasis supplied). As for the subjective component, the Eleventh Circuit has consistently required that "a defendant know of and disregard an excessive risk to an inmate's health and safety." Haney v. City of Cumming, 69 F.3d 1098, 1102 (11th Cir. 1995). Under the subjective prong, an inmate "must prove three things: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than [gross] negligence." Goebert, 510 F.3d at 1327; see also, Townsend v. Jefferson Co., 601 F.3d 1152, 1158 (11th Cir. 2010).

The objective evidence before the Court shows that Plaintiff did not agree with the courses of treatment Defendant Ferrell undertook for Plaintiff's myriad medical conditions. There is absolutely no evidence whatsoever that Defendant Ferrell was deliberately indifferent to Plaintiff's serious medical needs. On the contrary, the record is replete with instances of Defendant Ferrell and other medical care providers at Ware State Prison giving Plaintiff continuous medical care and treatment for the duration of his incarceration at Ware State Prison. For instance, Plaintiff admits that Defendant

AO 72A
(Rev. 8/82)

Ferrell saw him on numerous occasions and only contends that Defendant Ferrell did not provide him with what he considered "effective treatment". (Doc. No. 52-1, p. 38).

The Court's review of Plaintiff's documentation in support of his contentions reveals Plaintiff's dissatisfaction with the level of treatment he received while he was housed at Ware State Prison. (See, e.g., Doc. No. 1-2, pp. 5-17). The main focus of Plaintiff's documentation is regarding spastic dysphonia, which is a condition Plaintiff has been dealing with since 1990, at a minimum. The Court recognizes that botox injections are considered to be an effective treatment option for this condition, but it is not the only treatment option. (Doc. No. 1-3, pp. 15-23). Moreover, Plaintiff has been informed that spastic dysphonia is not a life threatening condition. (Id. at p. 15). Further, Plaintiff provided the Court with information regarding healthcare costs for inmates in Georgia generally, but there is no documentation that monetary considerations were given as reasons to deny Plaintiff any necessary medical treatment. In fact, the evidence reveals that Plaintiff was provided with large amounts of medications and given several tests for his many medical conditions which people who are not in prison have never received. The Court notes that Plaintiff submitted the Affidavits of several of his fellow inmates, but these Affidavits do not reveal that Defendant Ferrell may have been deliberately indifferent to Plaintiff's serious medical needs. (Doc. Nos. 53-33, -34, -35, -36, and -37). Finally, there is no evidence before the Court that a medical provider opined that any of Plaintiff's desired treatment options was required, only recommended, at the most.

In sum, Plaintiff has failed to create a genuine issue of material fact that Defendant Ferrell's care and treatment of Plaintiff's medical conditions rose to a

AO 72A
(Rev. 8/82)

constitutional-level violation. Plaintiff's claims "rest on a difference of opinion regarding the care that he [felt he] needed and received," which does not establish that Defendant Ferrell was deliberately indifferent to Plaintiff's serious medical needs. West v. Higgins, 346 F. App'x 423, 427 (11th Cir. 2009). This portion of Defendants' Motion should be **GRANTED**.

## II.    Respondeat Superior

Defendants assert that there is no evidence that Defendants Thomas, Adams, Donald, and Owens had reason to believe Defendant Ferrell acted with deliberate indifference toward Plaintiff's serious medical needs. Accordingly, Defendants assert that Defendants Thomas, Adams, Donald, and Owens are entitled to summary judgment.

Plaintiff contends that Defendants Thomas, Adams, Donald, and Owens are chief policymakers, managers, and supervisors of inmate healthcare, and they have the authority to control and change operating policies regarding inmate healthcare. Plaintiff alleges that Defendants Thomas, Adams, Donald, and Owens knew, or should have known, that the healthcare provided to inmates is constitutionally deficient. Plaintiff asserts that Defendant Donald's liability is established by his signature on the contract with Georgia Correctional Healthcare, his endorsement of the $500,000.00 bonus that resulted in the denials of services, and ordering budget cuts in the medical budget. Plaintiff asserts that he had several conversations with Defendant Thomas about his medical conditions, and, on at least one (1) occasion, Defendant Thomas agreed that Plaintiff needed treatment for at least two (2) of his conditions.

AO 72A
(Rev. 8/82)

In section 1983 actions, liability must be based on something more than a theory of respondeat superior. Braddy v. Fla. Dep't of Labor & Employment Sec., 133 F.3d 797, 801 (11th Cir. 1998). A supervisor may be liable only through personal participation in the alleged constitutional violation or when there is a causal connection between the supervisor's conduct and the alleged violations. Id. at 802. A "causal connection" may be established when the supervisor is well aware of a "history of widespread abuse" and fails to correct the alleged violations. Id. Constitutional "deprivations that constitute widespread abuse sufficient to notify the supervis[or] must be obvious, flagrant, rampant, and of continued duration, rather than isolated occurrences." Id. Having actual notice of the alleged unconstitutional practices combined with a refusal to investigate or respond comprises such a causal connection.

As the undersigned has found that Plaintiff failed to create a genuine issue of material fact as to an underlying constitutional violation, Defendants Thomas, Adams, Donald, and Owens cannot be liable for any alleged deliberate indifference to Plaintiff's serious medical needs. This portion of Defendants' Motion should be **granted**.

## III.    Retaliatory Transfer

Defendants assert that the only reason Defendant Thomas transferred Plaintiff was because Plaintiff was a medium security inmate, and she had to make room for 25 incoming close security inmates. Defendants contend that, even if Plaintiff can show that Defendant Thomas transferred Plaintiff because of a dispute over an auditor's report and/or her knowledge of a pending lawsuit, Defendant Thomas would have transferred Plaintiff because of his medium security status.

25

Plaintiff avers that Defendant Thomas retaliated against him for having the auditor's report and drafting a lawsuit by having him transferred to private prison which uses a different medical care service company. Plaintiff asserts that he is serving a life sentence and is disqualified from being placed in a lower security prison. (Doc. No. 7, p. 3).

"To state a First Amendment claim for retaliation, a prisoner need not allege violation of a separate and distinct constitutional right." Farrow v. West, 320 F.3d 1235, 1248 (11th Cir. 2003) (internal citations omitted). Rather, "[t]he gist of a retaliation claim is that a prisoner is penalized for exercising the right of free speech." Id. A prisoner can establish retaliation by demonstrating that the prison official's actions were "the result of his having filed a grievance [or lawsuit] concerning the conditions of his imprisonment." Id.

Once a defendant moves for summary judgment, "the plaintiff may not respond simply with general attacks upon the defendant's credibility, but rather must identify affirmative evidence from which a jury could find that the plaintiff has carried his or her burden of proving the pertinent motive." Crawford-El v. Britton, 523 U.S. 574, 600 (1998). The issue of intent is a question for the trier of fact. Direct evidence of an illegal motive will usually suffice to create a genuine issue of fact and preclude summary judgment. Harris v. Ostrout, 65 F.3d 912, 917 (11th Cir. 1995) (citing Swint v. City of Wadley, Ala., 51 F.3d 988, 1000 (11th Cir.1995)).

In her Affidavit, Defendant Thomas states that inmates at Ware State Prison were classified into six (6) different categories: trustee, minimum, medium, close, maximum, and high maximum. Defendant Thomas declares that, in 2008 and into

26

2009, Ware State Prison was transitioning into a close security prison, and the medium, minimum, and trustee security inmates were transferred to other prisons. Defendant Thomas also declares that she received an email from the Georgia Department of Corrections informing her that she had to select 25 medium security inmates to be transferred out of Ware State Prison. (Doc. No. 33-10, p. 9). Defendant Thomas states that Plaintiff was a medium security inmate at the time, and he was one of the 25 randomly-selected inmates for transfer. Defendant Thomas avers that her decision to transfer Plaintiff "was based solely on the fact that he was a [m]edium security inmate and that room had to be cleared at Ware State Prison for incoming [c]lose [s]ecurity inmates." (Doc. No. 33-10, pp. 3-4, ¶ 7). Defendant Thomas denies requesting that Plaintiff be transferred as retaliation for Plaintiff's possession of the audit report, preparation of a lawsuit, or for any reason other than Plaintiff was a medium security inmate.

Plaintiff declares in his Affidavit that his transfer to Wheeler Correctional did not go through the classification committee, the counselor, or the warden, as is usually required. Plaintiff also declares that Defendant Thomas' statement that Plaintiff's transfer was at random is untrue. Plaintiff avers that the transport records "can very easily expose Thomas has lied to try to conceal her real motives behind this retaliatory transfer," which happened, coincidentally, right after Defendant Thomas was told that she had to let him have the state auditor's report and right after Defendant Ferrell's final medical report, which described him as a chronic complainer who filed frequent grievances. (Doc. No. 52-1, p. 7). Plaintiff's mother submitted an Affidavit in which she declares that Defendant Thomas was given a copy of the lawsuit she typed on Plaintiff's

AO 72A
(Rev. 8/82)

behalf, and, about two (2) weeks later, Plaintiff was transferred away from her. (Doc. No. 68-1, pp. 28-29).

Defendants submitted a copy of an "Assignment Detail". This form states the reason for a reassignment request is for population distribution, that this request was of the administrative/positive type, and it was to make room for an inmate from Coffee Correctional. This reassignment was approved by "Detra Leary". (Doc. No. 33-10, p. 9). However, there is nothing on this form indicating to whom this Assignment Detail pertains. In addition, Defendants submitted a copy of two (2) versions of Standard Operating Procedure ("SOP") IID01-0002, which governs pre-transitional and/or transitional selection criteria and process. (Doc. No. 33-10, pp. 11-25). This SOP does not appear to be applicable to Plaintiff's transfer.

Plaintiff has created a genuine issue of material fact as to Defendant Thomas' proffered explanation of Plaintiff's transfer, and thus, a question remains whether Defendant Thomas retaliated against Plaintiff by transferring him to another penal institution. According to Plaintiff, Defendant Thomas became aware he had drafted a lawsuit[5], and he was transferred to another facility about two (2) weeks later. This is sufficient to survive this portion of Defendant's Motion for Summary Judgment, which should be **denied**.

IV.    **Qualified Immunity**

Defendant Thomas asserts that Plaintiff cannot show that she violated clearly established law. Defendant Thomas alleges that, even if Plaintiff can show that she

---

[5] Plaintiff is advised that his contention that Defendant Thomas took retaliatory action against him because he had a copy of the state auditors' report does not lend support to this contention. Plaintiff has no constitutional right to access this report, and such a contention cannot lend support for a retaliation claim. In contrast, Plaintiff does have a constitutional right to seek redress in the courts, and retaliatory action alleged to have been taken as a result of this exercise is actionable.

AO 72A
(Rev. 8/82)

acted with retaliatory intent, she is entitled to qualified immunity, as pre-existing law did not notify her that her actions would violate clearly established law.

Plaintiff contends that Defendant Thomas knew or should have known that she could not transfer him because he exercised his First Amendment rights. Plaintiff also contends that Defendant Thomas confiscated a typed draft of the lawsuit he was going to file against her.

"This Circuit generally follows a two-step analysis to determine if qualified immunity applies to any section 1983 claim. The first step is to determine 'whether the [defendant's] conduct amounted to a constitutional violation,' and the second step is to "analyze[ ] whether the right violated was 'clearly established' at the time of the violation.'" Harper v. Lawrence Co., Ala., 592 F.3d 1227, 1234 (11th Cir. 2010) (quoting Lewis v. City of West Palm Beach, Fla., 561 F.3d 1288, 1291 (11th Cir. 2009) (alterations in original). "Whether a constitutional right was 'clearly established' at the time of the violation turns on whether it would be clear to a reasonable [defendant] that his conduct was unlawful in the situation he confronted." Id. (quoting Gray ex rel. Alexander v. Bostic, 458 F.3d 1295, 1306 (11th Cir. 2006)). There are "three sources of law that would put a government official on notice of statutory or constitutional rights: specific statutory or constitutional provisions; principles of law enunciated in relevant decisions; and factually similar cases already decided by state and federal courts in the relevant jurisdiction." Id. (internal citation and punctuation omitted).

It was clearly established law in this Circuit at the time of Plaintiff's transfer that prison officials can not retaliate against an inmate for the exercise of his First

Amendment right to seek redress in the courts. Defendant Thomas is not entitled to qualified immunity. This portion of Defendants' Motion should be **denied**.

## V. Plaintiff's Damages Claim

Defendant Thomas alleges that Plaintiff has not alleged he suffered any physical injury arising from his retaliatory transfer claim. Accordingly, Defendant Thomas asserts, Plaintiff should be prohibited from recovering compensatory or punitive damages for any mental or emotional injury he may have suffered.

Plaintiff contends that he was transferred away from his mother, which is the injury he suffered. Plaintiff also contends that Defendant Thomas should not be permitted to "get away with" the retaliatory transfer without having to suffer any consequences. (Doc. No. 52, p. 25).

"No Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical injury." 42 U.S.C. § 1997e(e). The purpose of this statute is "to reduce the number of frivolous cases filed by imprisoned plaintiffs, who have little to lose and excessive amounts of free time with which to pursue their complaints." Napier v. Preslicka, 314 F.3d 528, 531 (11th Cir. 2002) (citing Harris v. Garner, 216 F.3d 970, 976-79 (11th Cir. 2000)). "Tracking the language of [this] statute, § 1997e(e) applies only to lawsuits involving (1) Federal civil actions (2) brought by a prisoner (3) for mental or emotional injury (4) suffered while in custody." Id. at 532. In Williams v. Brown, No. 08-16230, 2009 WL 2883496, at *5 (11th Cir. Sept. 11, 2009), the Eleventh Circuit stated that, "[C]ompensatory damages under § 1983 may be awarded only based on actual injuries caused by the defendant and cannot be presumed or based on the

AO 72A
(Rev. 8/82)

abstract value of the constitutional rights that the defendant violated. Pursuant to 42 U.S.C. § 1997e(e), in order to recover for mental or emotional injury suffered while in custody, a prisoner bringing a § 1983 action must demonstrate more than a *de minimus* physical injury." (internal citations omitted) (alterations in original). The Eleventh Circuit noted, however, that "[n]ominal damages are appropriate if a plaintiff establishes a violation of a fundamental constitutional right, even if he cannot prove actual injury sufficient to entitle him to compensatory damages." Id. at *6 (quoting Hughes v. Lott, 350 F.3d 1157, 1162 (11th Cir. 2003)). "Thus, a prayer for nominal damages is not precluded by § 1997e(e)." Id. (quoting Smith v. Allen, 502 F.3d 1255, 1271 (11th Cir. 2007)).

Plaintiff's assertion that his alleged retaliatory transfer resulted in him being away from his mother does not set forth the requisite physical injury to recover compensatory damages.

## CONCLUSION

Based on the foregoing, it is my **RECOMMENDATION** that Defendants' Motion for Summary Judgment be **GRANTED** in part and **DENIED** in part. Plaintiff's claims against Defendants Ferrell, Donald, Owens, and Adams should be **DISMISSED**. Plaintiff's retaliatory transfer claim against Defendant Thomas should remain pending.

**SO REPORTED** and **RECOMMENDED**, this _16th_ day of July, 2010.

JAMES E. GRAHAM
UNITED STATES MAGISTRATE JUDGE

AO 72A
(Rev. 8/82)